**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

LAKESHA HUDSPETH, ET AL.                    CIVIL ACTION NO. 04-0587

VERSUS                                      JUDGE S. MAURICE HICKS, JR.

CITY OF SHREVEPORT, ET AL.                  MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment (Record Document 39) filed

by Defendants, the City of Shreveport ("the City"), James N. Roberts, Jr. ("former Chief

Roberts"), Denver Ramsey ("Officer Ramsey"), and Steven Hathorn ("Officer Hathorn").

Defendants seek dismissal of all of Plaintiffs' claims.  Plaintiffs, the surviving spouse and

(represented by their mothers) the three minor children of Mr. Marquise Hudspeth ("Mr.

Hudspeth"), oppose the Motion for Summary Judgment.  See Record Document 49.  For

the reasons assigned herein, Defendants' Motion for Summary Judgment is **GRANTED**.

**I.    BACKGROUND.**

   **A.    Factual Background.**

      On or about the night time hours of March 15, 2003, Mr. Hudspeth was driving

southbound on Hearne Avenue.  See Record Document 12, ¶ 14.[1]  Officer Ramsey of the

Shreveport Police Department observed Mr. Hudspeth's vehicle and believed that Mr.

Hudspeth had failed to stop at a red light.  See id., ¶ 17; see also Record Document 39,

Exhibit 8 (Affidavit of Denver Ramsey), ¶ 1.  Officer Ramsey began to pursue Mr. Hudspeth

_____

         [1]The parties never specifically state the exact time of the events at issue in this
case.  The video evidence clearly shows that the vehicle pursuit and shooting took place
during night time hours.  See Record Document 39, Exhibits 2-4 & 15.  Further, in his
deposition, Officer Ramsey recalled that the shooting took place around 10:45-10:50 p.m.
See Record Document 49, Exhibit 2 at 45.

and recalled that he activated the overhead lights on his patrol car, which also activated the in-car video system. See Record Document 39, Exhibit 8, ¶ 1. Defendants' Exhibit 2 is the video captured by Officer Ramsey's in-car video system. During the vehicle pursuit, Officer Ramsey came to believe that Mr. Hudspeth was driving while intoxicated due to his erratic driving. See Record Document 49, Exhibit 2 (Officer Ramsey Deposition) at 99.

Officer Hathorn and Officer Michael Armstrong ("Officer Armstrong"), both officers of the Shreveport Police Department, also became involved in the vehicle pursuit. See Record Document 39, Exhibits 9 (Affidavit of Steven Hathorn) & 10 (Affidavit of Michael Armstrong). Officer Armstrong blocked traffic and then joined the pursuit of Mr. Hudspeth's vehicle. See id., Exhibit 10. Officer Hathorn was the third police vehicle in the pursuit. See id., Exhibit 9. The vehicle pursuit lasted approximately five minutes and eventually ended at the intersection of Hearne Avenue and Midway in the parking lot of a Circle K convenience store. See id., Exhibit 8, ¶¶ 2 & 3.

During the vehicle pursuit, Officer Ramsey communicated via radio with his supervisor, Sergeant Bobby Wilbert ("Sgt. Wilbert"). See Record Document 39, Exhibit 8, ¶ 1. In his affidavit, Officer Ramsey stated that the purpose of the communication was to advise Sgt. Wilbert of the circumstances of the pursuit because Officer Ramsey believed Mr. Hudspeth was not going to stop his vehicle. See id. Officer Ramsey stated in his deposition that he mentioned to his supervisor, via the radio, that Mr. Hudspeth was talking on a cell phone. See Record Document 49, Exhibit 2 at 100. Officer Ramsey further stated that he did not necessarily see the cell phone, but he could see Mr. Hudspeth's hand to his ear and assumed he was talking on a cell phone. See id. at 101. In his affidavit, Officer Hathorn recalled the radio communication between Officer Ramsey and

his supervisor, but stated that he did not focus on the details of that communication and did not hear that the suspect, Mr. Hudspeth, was talking on a cell phone during the vehicle pursuit. <u>See</u> Record Document 39, Exhibit 9, ¶ 2.

As stated previously, Mr. Hudspeth slowed his vehicle and pulled into a Circle K at the intersection of Hearne Avenue and Midway. Officer Ramsey entered the parking lot and pulled behind Mr. Hudspeth's vehicle. <u>See</u> Record Document 39, Exhibit 2 & Exhibit 8, ¶ 4. Officer Armstrong, who had been directly behind Officer Ramsey, entered the parking lot next and parked in front of and generally perpendicular to Mr. Hudspeth's vehicle. <u>See id.</u>, Exhibit 10, ¶ 2 & Exhibit 8, ¶ 4. Officer Hathorn was the third officer to enter the parking lot and parked to the left of and generally parallel to Officer Armstrong's vehicle. <u>See id.</u>, Exhibit 9, ¶ 2 & Exhibit 8, ¶ 4. The video evidence (Defendants' Exhibits 2-4) and the still image photographs (Defendants' Exhibits 5-7) taken from that video are the best evidence of what occurred in the Circle K parking lot. Defendants have also submitted, with no objection from Plaintiffs, a video of a synchronized three-way split screen that plays the video from each of the three police vehicles. <u>See id.</u>, Exhibit 15. However, due to the location of the police vehicles and Mr. Hudspeth, the first few seconds of the incident in the parking lot are not captured on the videotape; however, the Court has the officers' sworn recollection of those early events in the parking lot, namely the initial interaction between Mr. Hudspeth and Officer Armstrong.

According to his affidavit, Officer Armstrong believed that once Mr. Hudspeth's vehicle stopped, he was going to exit his vehicle and flee. <u>See</u> Record Document 39, Exhibit 10, ¶ 2. Officer Armstrong recalled that as he got out of his police vehicle, Mr. Hudspeth was already out of his vehicle and was coming toward him. Mr. Hudspeth

stopped, and using a two handed shooting stance, pointed an object that Officer Armstrong was positive was a gun. <u>See</u> Record Document 39, Exhibit 10, ¶ 3. Officer Armstrong further stated in his affidavit that these aforementioned events were not captured on videotape due to his and Mr. Hudspeth's location with respect to his police cruiser. <u>See id.</u> Finally, Officer Armstrong recalled that he did not have time to do anything but dive towards the back of his car because he believed that he was about to be shot. <u>See id.</u> Officer Armstrong stated that he was behind his car and the incident involving Mr. Hudspeth was over before he could become involved. <u>See id.</u>, ¶ 4.

In his affidavit, Officer Hathorn stated that once he observed Mr. Hudspeth's vehicle slow down and pull into the Circle K, he also believed, based on his knowledge of and participation in other pursuits, that Mr. Hudspeth was going to leave the vehicle and flee on foot. <u>See</u> Record Document 39, Exhibit 9, ¶ 3. According to his affidavit, as soon as Officer Hathorn exited his vehicle, he saw Mr. Hudspeth pointing what he believed was a small silver handgun directly at Officer Armstrong. <u>See id.</u>, ¶ 4. Again, this perceived threat was not caught on any of the police videos. <u>Id.</u> Officer Hathorn recalled instructing Mr. Hudspeth to "get down mother f*****" and that after he gave such instruction, Mr. Hudspeth turned slightly and pointed the object in his hands directly at Officer Hathorn. <u>See id.</u> Officer Hathorn also recalled that Mr. Hudspeth held the object in front of him with both arms extended in what appeared to be a shooting stance. <u>See id.</u> This sequence of events was captured on the video from Officer Armstrong's unit (approximately 05:18:00 to 05:18:25)[2] and a still image photograph of Mr. Hudspeth's stance can be seen in

[2]According to Defendants, the time of day on the videos from each of the police vehicles is slightly different. Therefore, the times referenced by Defendants and this Court

Defendants' Exhibit 5.  See id., Exhibits 3 & 5.  Officer Hathorn further stated that at this

time, he was directly in the line of fire of the object in Mr. Hudspeth's hands.  See id.,

Exhibit 9, ¶ 4.  In response to Mr. Hudspeth's stance and due to the object in his hands,

Officer Hathorn crouched down to avoid being shot by Mr. Hudspeth.  See id.  Not long

after crouching, Officer Hathorn fired two shots at Mr. Hudspeth because he "was positive

the suspect has a gun."  See id.  Officer Hathorn also recalled that he did not fire the first

two shots until he knew there was enough space between Mr. Hudspeth and Officer

Ramsey, as he did not want to hit Officer Ramsey.  See id.  Officer Hathorn's crouch and

the first two shots can be seen in the video identified as Defendants' Exhibits 2 and 15 at

05:18:00 to 05:18:25 and 05:21:00, respectively.

Next, the video evidence depicts a brief delay after the first two shots were fired by

Officer Hathorn until Mr. Hudspeth turned and again pointed what appears to be a small

handgun at Officer Hathorn, as Mr. Hudspeth is clearly using the shooting stance.  See id.,

Exhibit 3.  Defendants' Exhibit 6 is a still image photograph, which was taken from Officer

Armstrong's video, of this "turn."  At this time, Officer Hathorn can again be seen crouching

as he begins to shoot.  See id., Exhibits 3 and 9, ¶ 5.  Again, Defendants' Exhibit 7 is the

still image photograph that clearly shows Officer Hathorn crouching.  In his affidavit, Officer

Hathorn stated that he remembered "crouching while shooting because [he] thought that

[he] was about to be shot."  See id., Exhibit 9, ¶ 5.  In his affidavit, Officer Hathorn recalled

that he stopped shooting once Mr. Hudspeth went down, which is supported by the video.

See id., Exhibits 3 & 9, ¶ 5.  Officer Hathorn also stated that he did not see Mr. Hudspeth

---

refer to the time on the synchronized video compilation, i.e., Defendants' Exhibit 15.

ever drop what he believed was a hand gun and that at the time he began to shoot, he believed that Mr. Hudspeth had a gun. See id., Exhibit 9, ¶ 5.

Officer Ramsey recalled that as Mr. Hudspeth slowed and turned into the parking lot of the Circle K, he believed that he was going to leave his vehicle and run. See id., Exhibit 8, ¶3. According to Officer Ramsey, it was common for suspects to refuse to stop until they chose a location where they believed they could get away on foot, then jump and run from their vehicles. See id. Officer Ramsey also recalled that he could not use the training he had received on using verbal commands to have a suspect leave his vehicle under a controlled manner because Mr. Hudspeth immediately left his vehicle as soon as it stopped. See id., ¶ 5. Officer Ramsey stated that as soon as Mr. Hudspeth left his vehicle, he immediately moved towards the front of his vehicle and Officer Ramsey began to run after him because he believed that Mr. Hudspeth was going to flee. See id. Next, Officer Ramsey recalled that it was as Mr. Hudspeth stopped that he realized that Mr. Hudspeth was pointing an object in front of him with two hands outstretched. See id. This sequence of events can be seen on the video from Unit 138, Defendants' Exhibit 3. Specifically Officer Ramsey can be seen behind Mr. Hudspeth, who has his hands outstretched in front of him. Defendants' Exhibit 5 is the still image photograph of Mr. Hudspeth pointing a small, silver object outwards and Officer Ramsey's hand can be seen in the far right of the photograph. At the time of Defendants' Exhibit 5, Officer Ramsey was not aware of where Officer Armstrong was located, but had seen that Officer Hathorn was on the other side of the suspect, in the area where the suspect was pointing the object. See id., Exhibit 8, ¶ 5. Officer Ramsey made physical contact with Mr. Hudspeth at this time and recalled that it was at this point that Mr. Hudspeth began to turn toward him and

that he also realized that Mr. Hudspeth had a gun (or what Officer Ramsey believed to be a gun). See id. Officer Ramsey admitted in his affidavit that this sequence of events happened very quickly and that it took him a few seconds to realize that Mr. Hudspeth had a gun and to react. See id. In his affidavit, Officer Ramsey stated that he did not put his gun to Mr. Hudspeth's head on purpose nor did he put his gun to Mr. Hudspeth's face on purpose. Rather, this happened when Mr. Hudspeth stopped and turned towards him. See id. Next, Officer Ramsey remembered separating from Mr. Hudspeth and then hearing two shots, which were fired by Officer Hathorn. See id. This sequence of events can be seen in the video from Officer Ramsey's police unit, Defendants' Exhibit 2.

According to Officer Ramsey, shortly after the two shots were fired, he observed Mr. Hudspeth turn and point the object in his hands at Officer Hathorn again, a second time. See id., ¶ 6. Officer Ramsey shot at Mr. Hudspeth. See id. The still image photograph of the "turn" is Defendants' Exhibit 6. Officer Ramsey stated that he does not remember shooting more than one shot, but knew from watching the video that he had shot several times, until the suspect went down. See id. Officer Ramsey further stated that when he fired, he had no doubt in his mind that the object in Mr. Hudspeth's hands was a gun. See id. The video from unit 138 shows that neither Officer Hathorn nor Officer Ramsey continued to shoot after Mr. Hudspeth was down. See id., Exhibit 3.

Mr. Hudspeth was fatally shot at the conclusion of the aforementioned sequence of events.

### B.  Procedural Background.

On March 8, 2004, several surviving relatives of Mr. Hudspeth filed suit asserting federal and state law claims arising from the fatal shooting of Mr. Hudspeth by Shreveport

police.  See Record Document 1.  The named defendants in the suit were Officer Hathorn, Officer Ramsey, Officer Armstrong, the City, Mayor Keith Hightower, former Chief Roberts, City Administrative Officer Kenneth Antee, and Tom Cody (alleged to be "head of Risk Management").  See id.  On April 29, 2004, all Defendants joined in filing a Motion to Dismiss.  See Record Document 7.  On June 1, 2004, Plaintiffs opposed the Motion to Dismiss and filed a First Amended Complaint.  See Record Documents 11 & 12.

On September 1, 2005, this Court granted in part and denied in part the Motion to Dismiss filed by all Defendants. See Record Document 24.  After that ruling, the remaining plaintiffs in this case are Lakesha Hudspeth (the surviving spouse of Mr. Hudspeth) and three minor children of Mr. Hudspeth, all of whom are represented by their respective mothers.  The remaining claims are Title 42, United States Code, Section 1983 claims for violation of the Equal Protection Clause; Title 42, United States Code, Section 1983 claims for violation of the Fourth Amendment (excessive force); and state law survival and wrongful death actions.  The remaining defendants are Officer Hathorn, Officer Ramsey, former Chief Roberts, and the City.

On July 31, 2006, Defendants, the City, former Chief Roberts, Officer Hathorn, and Officer Ramsey filed a Motion for Summary Judgment  (Record Document 39) seeking dismissal of all of Plaintiffs' claims.  Plaintiffs oppose the Motion for Summary Judgment. See Record Document 44.

## II.     LAW AND ANALYSIS.

### A.     Summary Judgment Standard.

Summary judgment should be granted if the record, taken as a whole, "together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>New York Life Ins. Co. v. Travelers Ins. Co.</u>, 92 F.3d 336, 338 (5th Cir. 1996). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); <u>see also</u> <u>Gunaca v. Texas</u>, 65 F.3d 467, 469 (5th Cir. 1995). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting <u>Celotex</u>, 477 U.S. at 323-25, 106 S. Ct. at 2552). If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." <u>Little</u>, 37 F.3d at 1075.

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. <u>Wallace v. Texas Tech Univ.</u>, 80 F.3d 1042, 1046-47 (5th Cir. 1996). The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. <u>Little</u>, 37 F.3d at 1075; <u>Wallace</u>, 80 F.3d at 1047. Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." <u>Wallace</u>, 80 F.3d at 1048 (quoting

Little, 37 F.3d at 1075); see also S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." McCallum Highlands v. Washington Capital Dus, Inc., 66 F.3d 89, 92 (5th Cir. 1995), as revised on denial of rehearing, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51, 106 S. Ct. 2505, 2511 (1986).

In order to determine whether or not summary judgment should be granted, an examination of the substantive law is essential. Substantive law will identify which facts are material in that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id.

With these principles in mind, the Court now turns to a review of the claims at issue.

**B.      Title 42, United States Code, Section 1983.**

Section 1983 provides that "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Section 1983 does not create substantive rights, rather it is simply a procedural vehicle that provides a remedy for violation of the rights that it designates. See Harrington v. Harris, 118 F.3d 359, 365 (5th Cir. 1997). Therefore, "an underlying constitutional or statutory violation is a predicate to liability under § 1983." Id.

**C.      Qualified Immunity.**

The doctrine of qualified immunity provides that government officials performing discretionary functions generally are shielded from liability for civil damages to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. See Estate of Davis ex rel. McCully v. City of North Richland Hills, 406 F.3d 375, 380 (5th Cir. 2005).[3] Qualified immunity provides the right not to stand trial or confront other burdens of litigation, "conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." Id. (citation omitted). Qualified immunity is more than a mere defense to liability. See id. Rather, the doctrine provides immunity from suit. See id.

The Fifth Circuit has reasoned that before a district court adjudicates the merits of a plaintiff's claims, the plaintiff must overcome the bar of qualified immunity. See id. (citations omitted). Once the issue of qualified immunity is raised, a plaintiff has the burden of rebutting the defense by demonstrating that the government official's allegedly wrongful conduct violated clearly established law. See id. The Fifth Circuit does not command that the government official demonstrate that he did not violate clearly established federal rights because the precedent of this Circuit places such burden upon the plaintiff. See id. "Qualified immunity provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Id.

Simply put, the qualified immunity shield is broad and protects actions, even

_____

[3]Qualified immunity does not apply to claims against a municipality such as the City of Shreveport, but individual defendants may assert qualified immunity for claims against them for money damages.

mistakes, that are reasonable under the existing law.  See Fraire v. City of Arlington, 957

F.2d 1268 (5th Cir. 1992).  It is only when a plaintiff (1) establishes a violation of a clearly

established right; and (2) shows that the government official's conduct was objectively

unreasonable in light of the clearly established law at the time of the violation that such

government official will not be entitled to qualified immunity.  See Fontenot v. Cormier, 56

F.3d 669, 673 (5th Cir. 1995); Siegert v. Gilley, 500 U.S. 226, 111 S. Ct. 1789 (1991).  The

Fifth Circuit has stated that "[i]f reasonable public officials could differ on the lawfulness of

the defendant's actions, the defendant is entitled to qualified immunity."  Fraire, 957 F.2d

at 1273.

> **D.**    **Section 1983 Equal Protection Claims Against Officer Hathorn, Officer Ramsey, and the City.**

Plaintiffs argue that the actions of Officer Hathorn and Officer Ramsey violated Mr.

Hudspeth's right to be accorded equal protection under the Fourteenth Amendment.  See

Record Document  1, ¶ 35.  Both Officer Hathorn and Officer Ramsey contend that

Plaintiffs' equal protection claims fail on the merits or, at the least, they are entitled to

qualified immunity as to the equal protection claims.

Under the Fourteenth Amendment's Equal Protection Clause, persons similarly

situated should be treated alike.  See Williams v. Bramer, 180 F.3d 699, 705 (5th Cir.

1999).  To successfully make a claim under the Equal Protection Clause, a Section 1983

plaintiff must allege that a state actor intentionally discriminated against him because of

membership in a protected class.  See id.  Further, the plaintiff must demonstrate that the

purposeful discrimination motivating the state action caused the complained-of injury.  See

Johnson v. Rodriguez, 110 F.3d 299, 306-307 (5th Cir. 1997).  "Discriminatory purpose in

an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." Id.

In opposing the Motion for Summary Judgment, Plaintiffs argue that "there exist [sic] a genuine issue of material fact as to whether the animosity directed toward Hudspeth was based on his race." Record Document 49-1 at 10. Specifically, Plaintiffs emphasize Officer Hathorn's use of the derogatory phrase "mother f*****" towards Mr. Hudspeth and the officers' alleged unexplained animosity towards Hudspeth to support the Equal Protection claim. See id. Plaintiffs denied Defendants's Statement of Undisputed Facts ("SUF") No. 20,[4] yet came forward with nothing more than the unsupported allegation of "unexplained animosity and contempt toward Hudspeth" in support of that denial.

The Court has scoured the record and simply finds no evidence to support the contention that Mr. Hudspeth was shot because of his race. While it is true that Mr. Hudspeth was black and the officers involved in the shooting are white, there is nothing that remotely suggests that the officers involved in the shooting selected their course of action because of Mr. Hudspeth's race. Despite Officer Hathorn's admission of using the derogatory phrase "mother f*****" in commanding Mr. Hudspeth to get on the ground, Plaintiffs have come forward with no evidence that either Officer Hathorn or Officer Ramsey used a racial epithet or racially derogatory term. Plaintiffs are clearly relying on

_____

[4]SUF No. 20 states, in pertinent part:

The suspect's race played no part in Officer Hathorn's or Officer Ramsey's response or actions.

Record Document 39-4, ¶ 20.

scant evidence and conclusory allegations of some sort of unexplained animosity to support their equal protection claim. Even if the officers had some sort of unexplained animosity or hostility towards Mr. Hudspeth, Plaintiffs have failed to establish with competent summary judgment evidence that Officer Hathorn's or Officer Ramsey's allegedly wrongful conduct was intentional or purposeful discrimination based on race, as required by the Equal Protection Clause. The mere scintilla of evidence presented by the Plaintiffs as to the equal protection claim is simply not enough to sustain their equal protection claims. Accordingly, summary judgment is **GRANTED** as to Plaintiffs' equal protection claims against Officer Hathorn and Officer Ramsey.

Plaintiffs also asserted a Section 1983 claim against the City for violation of the Equal Protection Clause. As stated by the Magistrate Judge in the Report and Recommendation issued in this case previously, absent an underlying constitutional violation, there can be no Section 1983 liability imposed on a supervisor or municipality. See Becerra v. Asher, 105 F.3d 1042, 1047-48 (5th Cir. 1997) (stating "[i]t necessarily follows that, without an underlying constitutional violation, there can be no § 1983 liability imposed on the school district or the individual supervisors."); Saenz v. Heldenfels Bros., Inc., 183 F.3d 389, 392-93 (5th Cir. 1999) (stating "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized [his actions] is quite beside the point."). Here, the Court has ruled that Plaintiffs' mere scintilla of evidence as to their equal protection claims is insufficient for such claims to proceed. Because there was no finding of a violation of Mr. Hudspeth's equal protection rights and no viable equal protection claim against any individual defendant, there can be no municipal or supervisory liability with

respect to an equal protection claim. Accordingly, summary judgment is likewise **GRANTED** as to Plaintiffs' equal protection claim against the City.

> **E.    Section 1983 Excessive Force Claim Against Officer Hathorn and Officer Ramsey.**

Plaintiffs have alleged that Officer Hathorn and Officer Ramsey violated Mr. Hudspeth's Fourth Amendment right to be free from excessive force.  Again, both Officer Hathorn and Officer Ramsey have plead qualified immunity as to these Fourth Amendment claims.

The Fourth Amendment protects individuals against "unreasonable searches and seizures."  To state a claim of excessive force under the Fourth Amendment, a plaintiff must show both that a "seizure" occurred and that the seizure was "unreasonable." Brower v. County of Inyo, 489 U.S. 593, 599, 109 S.Ct. 1378, 1382-83 (1989).  "While it is not always clear just when minimal police interference becomes a seizure, there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699 (1985).

The elements necessary to prove an excessive force claim under Section 1983 are a significant injury which resulted directly and only from the use of force that was clearly excessive to the need, and the excessiveness of which was objectively unreasonable. See Carter v. Fenner , 136 F.3d 1000, 1010 (5th Cir. 1998), citing Johnson v. Morel, 876 F.2d 477, 480 (5th Cir.1989) (en banc).  Of importance, this standard "requires a showing that the force used was not only excessive, but clearly more than the force needed to subdue the threat." Carter, 136 F.3d at 1010.  Further, in order to determine the objective

reasonableness of the use of force in a particular situation, courts must judge from the perspective of a reasonable officer on the scene. See id., citing Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872 (1989).

Here, there is no dispute that Mr. Hudspeth suffered a significant injury. Further, the record supports, and this Court will assume for purposes of the instant Memorandum Ruling, that Mr. Hudspeth's death resulted directly and only from the shooting. Thus, the question in this case will center on whether the amount of force used by Officer Ramsey and Officer Hathorn was clearly excessive and objectively unreasonable.

This Court will primarily focus on the "objectively unreasonable" analysis. This analysis is essentially the same as the second step of the qualified immunity analysis–whether the government official's conduct was objectively unreasonable in light of the clearly established law at the time of the violation. See Fontenot, 56 F.3d at 673; Siegert, 500 U.S. 226, 111 S. Ct. 1789. In Reese v. Anderson, 926 F.2d 494 (5th Cir. 1991), the Fifth Circuit stated:

> The Supreme Court has instructed us on the proper standard for this inquiry:
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . [T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

Reese, 926 F.2d at 500. In answering the reasonableness question, this Court "must consider the totality of the circumstances." Id. Specifically, this Court must examine whether Mr. Hudspeth posed an immediate threat to the safety of the officers or others, and whether Mr. Hudspeth was actively resisting arrest. See id. In the context of a fleeing

suspect, the Supreme Court has reasoned:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon . . . deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Id., citing Garner, 471 U.S. at 11-12, 105 S.Ct. at 1701.

Applying the aforementioned standards, the Court finds that the actions of Officer Ramsey and Officer Hathorn were objectively reasonable in light of the clearly established law at the time of Mr. Hudspeth's shooting. At the outset, the Court notes that it found the video and still image photographic evidence in this case to be particularly instructive on this issue of reasonableness and the application of qualified immunity. This evidence provides an objective view of the events at issue in the instant matter. While the initial interaction between Officer Armstrong and Mr. Hudspeth was not captured on video, all other critical events are accounted for on the video and still image photographic evidence.

Officer Hathorn was the third officer to arrive on the scene. His arrival can be seen on the top screen of the video compilation.[5] See Record Document 39, Exhibits 2 & 15. The video compilation is essentially an independent verification of Officer Hathorn's affidavit. The video shows Officer Hathorn's arrival on the scene, his exit from the police unit, and a brief duck/crouch behind the left door/left front wheel area of his police unit, followed by firing two shots toward Mr. Hudspeth as Officer Hathorn rises from behind the

---

[5]Defendants' Exhibit 15 is the compilation video, which shows three individual horizontal screens. The top screen is the video from Officer Ramsey's vehicle; the middle screen is the video from Officer Armstrong's vehicle; and the bottom screen is the video from Officer Hathorn's vehicle.

left door/left front wheel area of his police unit.  See id.  While watching the top two screens of the video compilation, it is clear to the Court that Officer Hathorn ducked in reaction to Mr. Hudspeth's pointing a small silver object, while standing in a shooting stance, in the direction of Officer Hathorn.  See id., Exhibit 15.  A still image photograph of Mr. Hudspeth pointing the object and of his stance can be seen in Defendant's Exhibit 5.  As stated by Officer Hathorn and supported by the video compilation, Officer Hathorn could not shoot toward Mr. Hudspeth at the time of the "shooting stance," as seen in Exhibit 5, because Officer Ramsey was in the line of fire.[6]  The sound of the first two shots can be heard on the video just as the video shows that there was enough distance between Mr. Hudspeth and Officer Ramsey for shots to be fired in such a way that Mr. Hudspeth, the intended target, could be engaged without injuring Officer Ramsey.

Again, the reasonableness inquiry is objective.  The Court is not to question the underlying intent or motivation of Officer Hathorn, or for that matter the intent or motivation of Mr. Hudspeth.  Instead, the focus is whether Officer Hathorn's actions in firing the first two shots were objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation.  At the time Officer Hathorn fired the first two shots, he was faced with an instantaneous decision.  As evidenced by the video compilation, Mr. Hudspeth had just pointed a small silver object, while standing in a

[6]The Shreveport Police Department's Use of Force directive states:

Firearms will only be employed when the officer reasonably expects that the intended target will be successfully engaged.  (shall not be discharged when it appears likely that an innocent person may be injured).

Record Document 39, Exhibit 12 at 1131.

shooting stance, in Officer Hathorn's direction.  Further, Officer Hathorn knew that Mr. Hudspeth, whom he believed was armed with a small handgun, was in close proximity to Officer Ramsey and that Officer Armstrong was also nearby.  And while Officer Hathorn could not fire his weapon at the exact moment Mr. Hudspeth pointed the small silver object at him, it was reasonably objective, and in accordance with the Shreveport Police Department's Use of Force Directive, for him to wait and fire after there was distance between Mr. Hudspeth and Officer Ramsey, since there was no indication that Mr. Hudspeth had dropped the small silver object and/or was no longer a danger to Officer Hathorn and other officers nearby.  Therefore, judging this situation from an objective viewpoint and taking all factors into consideration, a reasonable officer in Officer Hathorn's position could well fear for his safety and that of other officers nearby.

As seen in the video evidence, the first two shots fired by Officer Hathorn either missed Mr. Hudspeth or had no effect on him.  The video compilation shows Mr. Hudspeth walking away, with Officer Hathorn and Officer Ramsey following behind him.  Again, at this point, there was no indication that Mr. Hudspeth had dropped the small silver object and reasonable officers could have believed that he was fleeing, with his weapon in tow, and/or that he was moving to take cover and/or to gain a superior position against the officers.[7]

_____

[7]In a case such as the instant matter, the same principles apply whether the officers were trying to prevent Mr. Hudspeth's escape or trying to prevent their own serious bodily injury or death.  See Fraire v. City of Arlington, 957 F.2d 1268, 1276 (5th Cir. 1992) (stating that "[a]t the moment of the shooting, [the officer] does not appear to have been trying to hinder [the suspect's] escape.  Rather, as [the officer] avers, he clearly appears to have been trying to prevent his own serious injury or death.  Certainly then, because under the rationale of Garner [the officer] could have used deadly force to prevent [the suspect's] escape, considering [the suspect's] actions leading up to the shooting, i.e., drinking while driving, erratic driving, high speed through a residential subdivision, twice crashing the car, [the officer] must have been justified in firing to prevent his own death or great bodily

The video evidence shows a two to three second delay between the first two shots and then Mr. Hudspeth whips around and again points the small silver object, while standing in a shooting stance, at Officer Hathorn.  <u>See</u> Record Document 39, Exhibits 3 & 15.  The still image photograph of Mr. Hudspeth's turn can be seen in Defendants' Exhibit 6.  The video and still image photograph evidence clearly show Officer Hathorn again duck/crouch in response to Mr. Hudspeth's pointing the small silver object, while standing in a shooting stance, toward him.  Just as quickly as he whipped around toward Officer Hathorn, Mr. Hudspeth turns back around and continues to walk away, again with no indication that he has dropped what the officers believed to be a weapon.  At this precise instant, Officer Hathorn and Officer Ramsey fire the second round of shots at Mr. Hudspeth.  The video evidence does show that the officers continued to shoot until the perceived threat ceased, <u>i.e.</u>, when Mr. Hudspeth fell to the ground, which does mean that shots were fired at Mr. Hudspeth's back and side.  However, there is no evidence to support any contention that Mr. Hudspeth was shot after he fell to the ground.

Plaintiffs contend that the actions of Officer Hathorn and Ramsey, in firing the second round of shots, were unreasonable because Mr. Hudspeth was simply attempting

_____

harm.).  Such rationale is in accord with the opinion of defense expert Ken Katsaris, who stated in his affidavit:

> Although subjectively these officers were not trying to prevent Hudspeth's escape, viewed objectively, the could have done so.

Record Document 39, Exhibit 19 at 5.

to turn and walk away from the officers. See Record Document 49-1 at 4. Plaintiffs maintain that Mr. Hudspeth was ambushed and that "after [he] turned his back to retreat from the officers he did not give them any basis to believe he was a threat." See id.; Record Document 49-3, ¶ 16. Likewise, Plaintiffs argue that Mr. Hudspeth's turns/spins were simply his attempts "to shew [the officers] the f*** away." Record Document 49-1 at 4. Plaintiffs emphasize that Mr. Hudspeth was shot eight times in the back while he was walking away from Officer Hathorn and Officer Ramsey. See id.[8] Finally, Plaintiffs contend that Mr. Hudspeth was never a threat because all Defendants have now admitted he was unarmed.

First, this Court notes that under Fifth Circuit jurisprudence, the fact that Mr. Hudspeth was actually unarmed is not relevant to the determination of objective reasonableness. See Reese, 926 F.2d at 501. Further, Plaintiffs' attempt to convince this Court that qualified immunity is *per se* inappropriate because Mr. Hudspeth was shot in the back also fails. Both Officer Hathorn and Officer Ramsey have stated that they were taught that when it was appropriate to use lethal force, they should shoot at the center mass of the target until the threat ceases. See Record Document 39, Exhibits 8 & 9. The video evidence clearly shows that Mr. Hudspeth moved quickly, as shown by his repeated turns and "whip arounds." His final turn/whip around showed the speed with which he could turn and potentially fire what objectively appears to be a weapon at the officers. Further, the video evidence does not show that Mr. Hudspeth discarded the small silver

---

[8]The autopsy report of Mr. Hudspeth is not part of the summary judgment evidence. Notwithstanding, the Court will consider Plaintiffs' contention that Mr. Hudspeth was shot in the back to be true.

object that the officers believed to be a small handgun. Based on these objective factors, a reasonable officer could have easily perceived a continued threat of seriously bodily injury or death from Mr. Hudspeth, despite the fact that he was not facing the officers at the time all of the second round of shots were fired. A reasonable officer could have feared that Mr. Hudspeth would again turn around quickly and possibly shoot them before they could react, especially in light of the speed with which Mr. Hudspeth had turned and whipped around with when he pointed the small silver object at Officer Hathorn. Moreover, even Plaintiffs' expert stated in his deposition that he does not teach officers that they can never shoot a suspect in the back. See Record Document 62-1, Exhibit A (Affidavit of Melvin L. Tucker) at 137-139. Rather, the expert admits that officers are taught to shoot center mass, whether in the back or in the front, until the threat ceases. See id. at 138. The expert also stated that he trains officers to be alert for a situation wherein a suspect could turn and be a quick threat. See id. at 139. Therefore, in accordance with the foregoing, this Court finds that it was objectively reasonable for the officers to believe that Mr. Hudspeth remained a viable threat of serious bodily injury or death until he went down or dropped the small silver object he had repeatedly pointed at the officers.[9]

Plaintiffs further argue that there exists a genuine issue of material fact precluding qualified immunity on the ground that Officer Ramsey did not give any verbal commands or statements to Mr. Hudspeth. See Record Document 49-1 at 3. They further contend

_____

[9]The Court found support for this finding in a recent case involving a suspect who was shot in the back while fleeing from police, wherein the United States Supreme Court suggested that if an officer's actions fall in that hazy border between excessive and acceptable force, then by no means is it clearly established that the officer's conduct violated the Fourth Amendment. See Brosseau v. Haugen, 543 U.S. 194, 201, 125 S.Ct. 596, 600 (2004).

that because no verbal commands were given by any of the officers involved in the incident, Mr. Hudspeth had no way of knowing that the stop and the officers' attempt to gain control of him were pursuant to official police business. The Court finds that the officers failure to issue verbal commands or warnings in this case does not preclude qualified immunity. Again, the video evidence shows immediately after he stopped his vehicle, Mr. Hudspeth exited and began to walk away. This occurrence alone prevented Officer Ramsey from following procedures for a "high risk" traffic stop, wherein officers use commands and remove subjects from the vehicle under controlled circumstances. See Record Document 39, Exhibit 13, ¶ 3. Further, under the <u>Tennessee v. Garner</u> standard, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." <u>Tennessee</u>, 471 U.S. at 11-12, 105 S.Ct. at 1701. The Shreveport Police Department's Use of Force directive is also in line with such standard, as it states that "before using a firearm, police officers shall identify themselves and state their intent to shoot, *when possible*." Record Document 39, Exhibit 12 (emphasis added). After reviewing the summary judgment evidence, namely the video evidence, the Court finds as a matter of law that this was a case where verbal commands at the beginning of the traffic stop and/or verbal warnings before shooting were simply not feasible. The video shows that as soon as Mr. Hudspeth stopped his vehicle, he exited, was non-compliant with Officer Ramsey, and then clearly acted by pointing a perceived weapon using a shooting stance. This left the officers in an untenable and rapidly evolving situation. Their failure to issue verbal warnings was objectively reasonable under these

circumstances.

In opposing the Motion for Summary Judgment, Plaintiffs also argued that qualified immunity is not appropriate in this case because the officers did not shoot Mr. Hudspeth "when they initially perceived that [he] was pointing a gun at a fellow officer." See Record Document 49-1 at 8. The Court disagrees. The officers were faced with a rapidly evolving situation and at least three officers were in close proximity to each other and Mr. Hudspeth. Specifically, the Court finds that Officer Hathorn's decision not to shoot toward Mr. Hudspeth at the time of Defendants' Exhibit 5 (Mr. Hudspeth pointing the small silver object toward Officer Hathorn while in a shooting stance) was objectively reasonable, as Officer Ramsey was in the line of fire and because the Shreveport Police Department's Use of Force directive states that firearms shall not be discharged when it appears likely that an innocent person may be injured.

In determining that the actions of Officer Ramsey and Officer Hathorn were objectively reasonable, the Court primarily relied on the video and still image photograph evidence but also found persuasive guidance in an unpublished Sixth Circuit case, Bell v. City of East Cleveland, 125 F.3d 855 (6th Cir. 1997), wherein the court analyzed the qualified immunity doctrine in the context of a police officer who used deadly force against a young boy who was holding a toy gun. The Bell court stated:

> Under Graham, we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

Id. at *3. Applying this standard, the court concluded that the actions of the officer were

reasonable when he shot the young boy where the officer had been told that a young boy was carrying a gun in his front pocket; the officer commanded the boy to drop down; the boy, whose back was to the officer, did not follow the commands.  <u>See id.</u>  Further, after failing to follow the officer's commands, the boy pulled up his shirt with his left hand, put his right hand in front of his body beyond the officer's view, and then turned toward the officer with what appeared to be a gun in his hand.  <u>See id.</u>  The boy was pointing the gun at the officer when the officer shot him.  <u>See id.</u>  Plaintiffs had argued that the qualified immunity was inappropriate because the boy may have been trying to show the officer that the gun he was carrying was not real.  <u>See id.</u>  In response to such argument, the Sixth Circuit reasoned that the issue was not what was in the mind of the boy when he turned around with the gun in his hand, but rather whether a reasonable officer in that situation would have feared for his life.  <u>See id.</u> at *4.  In further addressing the argument that the young boy might have been trying to show the officer that the gun was fake, the Sixth Circuit relied on <u>Wilson v. Meeks</u>, 52 F.3d 1547 (10th Cir.1995):

> Perhaps [the decedent] intended to surrender. If so, his death is particularly tragic. However, the inquiry here is not into [the decedent's] state of mind or intentions, but whether, from an objective viewpoint and taking all factors into consideration, [the officer] reasonably feared for his life.  Qualified immunity does not require that the police officer know what is in the heart or mind of his assailant.

<u>Id.</u>  Hence, the <u>Bell</u> court concluded that what the young boy was thinking as he turned toward the officer was not relevant to the inquiry of the reasonableness of the officer's actions.  <u>See id.</u>

This line of reasoning is particularly important to counter Plaintiffs arguments that qualified immunity is not appropriate because Mr. Hudspeth was attempting to show the

officers that the object in his hand was his cell phone and because Officer Ramsey and Officer Hathorn did not have objective evidence of Mr. Hudspeth's violent intentions. See Record Document 49-1 at 3, 8. In determining whether the qualified immunity doctrine is applicable, what was in the mind of Mr. Hudspeth is simply not relevant, as qualified immunity does not require police officers to know what is in the heart or mind of a suspect. If Mr. Hudspeth was truly trying to show the officers that the small silver object in his hands was his cell phone and he had no violent intentions, then his death is even more tragic. But the inquiry before this Court at this stage in the litigation is simply whether a reasonable officer in the situation faced by Officer Hathorn and Officer Ramsey would have feared for their lives or the lives of other close by.

The Court also reviewed an Eastern District of Louisiana case, wherein the court analyzed qualified immunity in a case where police officers who had responded to a hostage situation used deadly force against a suspect who was armed with a toy gun. See Reneau v. City of New Orleans, No. Civ.A. 03-1410, 2004 WL 1497711 (E.D. La. July 2, 2004). In Reneau, the suspect exited a shed, pointed a gun at the officer, and advanced toward the officer. See id. at *1. The officer yelled at the suspect to put the gun down, but the suspect refused and kept moving forward. See id. The officer believed his life was in imminent danger and fired several times at the suspect. See id. Another officer witnessed these events and also began to fire shots. See id. The suspect was killed and when the police officers reached the suspect, they found that the gun he was pointing at them was a toy gun. See id. Plaintiffs argued that the suspect was not armed with a deadly weapon, but rather with a toy gun and that the officer should not have been in reasonable fear for his life. See id. at *3. The district court concluded:

> [W]hether the [officers] could have employed a better procedure to deal with the decedent is immaterial to the question of whether deadly force was excessive at the moment that the [officers] fired on the decedent. . . . There is no evidence before the Court to indicate that the [officer] or anyone else other than [the suspect] knew that the gun was a toy. The gun looked real and it was reasonable under the circumstances for [the officer] to believe that it was, in fact, real. Under these circumstances, [the officer] had probable cause to believe that his life was in danger. Likewise, [the other officer] had probable cause to believe that [the first officer's] life was in danger. While the death of [the suspect] is certainly tragic, under the circumstances, the officers reacted in a reasonable and appropriate way.

Id. Thus, the court did not even reach the issue of reasonableness because it determined that there had been no constitutional violation, as the officers' use of lethal force was not excessive. See id. at *4. Based on dicta, this Court infers that because the Reneau court found that the officers' actions did not violate the suspect's constitutional right to be free from excessive force, the officers' actions were objectively reasonable under the circumstances. Therefore, had the defense of qualified immunity been necessary for the officers in Reneau, they would have been entitled to its use.

Reneau provided guidance to this Court in rebutting Plaintiffs' argument that Officer Ramsey and Officer Hathorn "should be denied qualified immunity because their assertion that they actually believed that [Mr.] Hudspeth was armed with a gun is contrary to the facts and even common sense." Record Document 49-1 at 8. They seem to base this argument on the fact that none of the officers yelled "gun," which is purportedly contrary to their training. See id. This Court finds that it is simply immaterial to the question of objective reasonableness under the qualified immunity doctrine whether Officer Hathorn and Officer Ramsey could have employed a better procedure to deal with Mr. Hudspeth at the moment that they fired on the decedent. The video and still image photograph evidence, viewed objectively, clearly show that a reasonable officer could have believed that Mr. Hudspeth

was armed with a gun and that such belief would not be contrary to common sense. Further, while Officer Ramsey has admitted that he knew Mr. Hudspeth had been talking on a cell phone and, even assuming that Officer Hathorn also knew that Mr. Hudspeth had been talking on a cell phone, the Court finds that it was still reasonable under the circumstances for the officers to have believed that the small silver object being held by Mr. Hudspeth, especially in light of his aggressive shooting stance, was, in fact, a small handgun. Under these circumstances, the officers had probable cause to believe that their lives were in danger, despite the fact that no one yelled gun. Applying the legal principles set forth in Reneau further strengthens this Court's belief that both Officer Hathorn and Officer Ramsey reacted in an objectively reasonable way.

Again, this Court must judge the reasonableness of Officer Hathorn's and Officer Ramsey's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Reese, 926 F.2d at 500. The inquiry is whether their actions were objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See id. Here, the Court has the undisputed video evidence, but even then it is easy to allow "hindsight" to enter into the analysis. There is simply no way to avoid the facts shown on the video – Mr. Hudspeth repeatedly brought up both hands with both arms extended in front of him in a universally recognizable shooting stance, all the while holding a small silver colored object in his hands. As viewed in the video and still image photographs, that silver object reasonably looks like a small handgun. Plaintiffs argue that the officers should have known the object was not a handgun because Mr. Hudspeth had been talking on his cell phone. Yet, the officers were faced with a rapidly evolving situation. In the time it would have taken the

officers to distinguish whether Mr. Hudspeth had a real gun or a cell phone, Mr. Hudspeth could have fired multiple rounds at them. The Court notes that Mr. Hudspeth never stopped, never raised his hands above his head, never dropped the silver object; rather, he continued to hold the silver object in his hands while standing in an aggressive two-handed shooting stance. Under these facts and circumstances, it was objectively reasonable for the officers to interpret Mr. Hudspeth's actions as a lethal threat, or at the least a threat of serious bodily injury. Accordingly, Officer Hathorn and Officer Ramsey are entitled to qualified immunity and summary judgment is **GRANTED** as to Plaintiff's Fourth Amendment excessive force claims against both officers.

### F. Section 1983 Claims Against Former Chief Roberts.

Using Section 1983 as their procedural vehicle, Plaintiffs have alleged a violation of the constitutional right to be free of excessive force under the Fourth Amendment against former Chief Roberts. Plaintiffs seek to hold former Chief Roberts liable in both his individual and official capacities. Their claims against former Chief Roberts in his official capacity are tantamount to claims against the City. See Roberts v. City of Shreveport, 397 F.3d 287, 291 (5th Cir. 2005) (citations omitted). The claims against the City will be addressed in turn but the Court will first address the claims against former Chief Roberts in his individual capacity.

Supervisory officials such as former Chief Roberts can not be held liable under Section 1983 for the actions of subordinates, such as Officer Hathorn and Officer Ramsey, on any vicarious liability or respondeat superior liability theories. See Estate of Davis ex rel. McCully v. City of North Richland Hills, 406 F.3d 375, 381 (5th Cir. 2005). Instead,

Plaintiffs must show that the conduct of former Chief Roberts denied Mr. Hudspeth of his constitutional rights.  See id.  Plaintiffs in the instant matter allege that former Chief Roberts, a supervisor, failed to properly train and supervise officers such as Officer Hathorn and Officer Ramsey.  Therefore, they must prove that "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of [Mr. Hudspeth's] rights; and (3) the failure to train or supervise amounts to deliberate indifference."  Id.

To recover under a failure to train or supervise theory, a plaintiff must show that the supervisory official, in this case former Chief Roberts, failed to control an officer's "known propensity for the improper use of force."  Roberts, 397 F.3d at 293.  Such deliberate indifference, i.e., the third prong of the aforementioned standard for supervisory liability, is a stringent standard of fault that requires proof that a municipal actor disregarded a known or obvious consequence of his action.  See Estate of Davis, 406 F.3d at 381.   To act with deliberate indifference, the municipal "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id.  A showing of negligence or gross negligence does not rise to the level of deliberate indifference.  See id.  Further, a municipal official's actions and decisions that are simply inept, erroneous, ineffective, or negligent do not equate to deliberate indifference and do not strip such official of qualified immunity.  See id.  To meet the stringent standard of deliberate indifference, a plaintiff generally must prove not only a pattern of violations, but also that the inadequacy of the training or supervision was obvious and obviously likely to result in a constitutional violation.  See id.  Simply put, for former Chief Roberts to be held liable as a supervisor, Plaintiffs must establish at least a

pattern of violations (fairly similar to what ultimately transpired) on the part of Officer Hathorn or Officer Ramsey so that the failure of former Chief Roberts to respond with different training or supervision reflects a deliberate or conscious choice to endanger constitutional rights. See id. at 381-83; see also Roberts, 397 F.3d at 292.

### A. Failure to Train Claim.

The Court must focus on the adequacy of the training program in relation to the task the particular officers must perform in order to determine whether former Chief Roberts is liable for failure to train. See Roberts, 397 F.3d at 293. Mere proof that Mr. Hudspeth's death could have been prevented if the officer had received better or additional training cannot, without more, support liability. See id. Moreover, a plaintiff must allege with specificity how a certain training program is defective in order for liability to attach based on an inadequate training claim. See id.

Here, former Chief Roberts is alleged to have been responsible for the training of police officers. Specifically, Plaintiffs contend that former Chief Roberts failed to train Officer Hathorn and Officer Ramsey "in the proper procedures for . . . the making of a legal arrest, the use of firearms in accordance with the laws, statutes, ordinances, regulations, customs, and usages of [the] City of Shreveport and the State of Louisiana, and the United States of America, the duty to not use deadly force to stop a fleeing suspect, the duty to give a warning prior to using deadly force, [and] the duty to not use deadly force unless the suspect actually threatens the officer with a weapon." Record Document 12, ¶ 88. Plaintiffs also maintain that former Chief Roberts improperly trained Officer Hathorn and Officer Ramsey with respect to the procedure to approach and question a suspect and the proper use of deadly force. See id., ¶ 95. In support of these allegations, Plaintiffs seem

to place great weight on the fact that deadly force was used against an individual later found to be unarmed.

The Court finds that Plaintiffs' failure to train claims fail the first prong of supervisory liability, i.e., former Chief Roberts failed to train the officers. Plaintiffs have failed to create a fact issue concerning whether former Chief Roberts offered insufficient or inadequate training on how to make an arrest, the use of firearms, the use of deadly force, and/or the use of verbal warnings. The record evidence clearly shows that both Officer Hathorn and Officer Ramsey received extensive training on the use of verbal commands for a suspect to leave his vehicle under a controlled manner and even more extensive training as to the proper uses of force and lethal force at the Shreveport Police Academy, during field training, and during yearly re-training. See Record Document 39, Exhibit 8, ¶¶ 5, 7-9, 12 & Exhibit 9, ¶¶ 6-7, 9-10. Further, former Chief Roberts has provided evidence that his officers, including Officer Hathorn and Officer Ramsey, were privy to a comprehensive policy on the use of lethal force, including a fourteen to sixteen week police academy training program designed to ensure that officers understand the circumstances under which lethal force is appropriate. See id., Exhibit 11, ¶ 6. Former Chief Roberts also supplied evidence that beginning in 1999 he required all officers to undergo forty hours of additional training each year. See id. The evidence supplied by former Chief Roberts is likewise supported by the affidavit of Mike Campbell ("Campbell"), who was the director of the Shreveport Police Academy in March 2003. See id., Exhibit 13. Campbell specifically stated that he was familiar with the training provided to Officer Hathorn and Officer Ramsey and that such training included hundreds of hours of academy instruction on the use of force and lethal force. See id., Exhibit 13, ¶ 2. Further, the City of Shreveport Police

Department has a comprehensive policy on the use of deadly force.  See id., Exhibit 12.

Such policy includes reference to United States Supreme Court opinions and states that

verbal warnings should be given *when possible*.  See id. at 1130-1131 (emphasis added).

This Court has carefully reviewed the record and finds that this thorough training regimen

was simply not disputed by the Plaintiffs' scant evidence.  In light of this training regimen,

it cannot be said that any alleged inadequacy or insufficiency of training as to Officer

Hathorn and/or Officer Ramsey was so obvious or so obviously likely to result in a

constitutional violation that former Chief Roberts should be  divested of qualified immunity.

Therefore, former Chief Roberts is entitled to qualified immunity and summary judgment

as to the failure to train/improper training claims against him in his individual capacity is

**GRANTED**.[10]

### B.    Failure to Supervise Claim.

Plaintiffs allege that former Chief Roberts condoned and cultivated a culture of using

excessive force against African Americans.  Plaintiffs describe four incidents in their

complaint where they allege white Shreveport police officers used excessive and/or lethal

force against unarmed African Americans.  Plaintiffs allege that former Chief Roberts was

aware of these incidents, as well as a lawsuit in which Officer Ramsey was alleged to have

used excessive force against an African American female, but did not provide better

supervision to such officers.  In opposing the Motion for Summary Judgment, Plaintiffs

---

[10]Further, even if this Court assumed that Officer Hathorn used excessive force, Plaintiff's failure to train claim against former Chief Roberts would fail on the deliberate indifference prong also.  There is simply no evidence in the record that Officer Hathorn had ever engaged in similar misconduct and, therefore, Plaintiffs have failed to show a pattern of unconstitutional activity of which former Chief Roberts should have been aware.  See Roberts, 397 F.3d at 295.

argue that they "have proven the personal responsibility required to hold the [former] Chief responsible."  Record Document 49-1 at 9.  Plaintiffs rely on the allegation that "Chief Roberts has never sustained an allegation that a SPD officer used excessive force, and has never terminated an officer for using excessive force."  Record Document 49-3, ¶ 23. Plaintiffs also contend that former Chief Roberts did not terminate, discipline, or provide additional training to a police officer who a federal jury allegedly found had used excessive force.  See id.

Plaintiffs failure to supervise claim falls on the third prong of the supervisory liability test, i.e., deliberate indifference.  Under the deliberate indifferent standard, Plaintiffs must show at least a pattern of violation (fairly similar to what ultimately transpired) so that the failure of the supervisor to respond with better supervision reflects a deliberate or conscious choice to endanger constitutional rights.  See Estate of Davis, 406 F.3d at 381-83; Roberts, 397 F.3d at 292.  Plaintiffs must also show that former Chief Roberts failed to control an officer's *known* propensity for the improper use of force.  See Roberts, 397 F.3d at 292 (emphasis added).

As to Officer Hathorn, Plaintiffs have come forward with no competent summary judgment evidence that demonstrates a prior pattern of Officer Hathorn violating constitutional rights by employing excessive force.  Therefore, as to Officer Hathorn, there is no conduct from which it could be reasonably concluded that former Chief Roberts made a deliberate or conscious choice to endanger constitutional rights.  See Estate of Davis, 406 F.3d at 385.

In asserting their supervisory liability claim against former Chief Roberts, Plaintiffs have placed great weight on an incident during which Officer Ramsey allegedly used

excessive force against a black female.  While the record is somewhat unclear, the Court assumes Plaintiffs are referring to an incident that was discussed during the depositions of both Officer Ramsey and former Chief Roberts.  In his deposition, Officer Ramsey recalled responding to a "fight call" in 1999 or 2000 at a party on Lillian Street.  Record Document 49, Exhibit 2 at 123.  Officer Ramsey stated in his deposition that a lawsuit was filed as a result of his response to the fight call, but that he did not recall the specific allegations made against him.  See id. at 124.  He did remember that he had used his PR-24 baton against a female at the party.  See id.  When asked if the lawsuit was settled, Officer Ramsey stated that he did not know "what happened to it [the lawsuit]."  Id.  Officer Ramsey also admitted that he did not recall receiving additional training after this use of force and that he was not disciplined as a result of this incident.  See id.

During his deposition, former Chief Roberts was asked about the Lillian Street party incident involving Officer Ramsey and stated that he did not recall the specific incident. See id., Exhibit 1 at 22.  Former Chief Roberts also testified that if the lawsuit that was filed in response to the Lillian Street party incident was settled, he would not have necessarily had anything to do with the settlement.  See id.

As in the case with Officer Hathorn, Plaintiffs have simply fallen far short in attempting to demonstrate a pattern of unconstitutional conduct on the part of Officer Ramsey.  Their proffered evidence of a pattern involves only one other incident and the details of such event, as provided in the summary judgment record, are sketchy at best. Further, even if the allegations regarding Officer Ramsey's excessive use of non-lethal force at the Lillian Street party are taken as true, such evidence is legally insufficient–and thus not material–to support a finding of deliberate indifference.  See Estate of Davis, 406

F.3d at 382.  A past incident involving Officer Ramsey's alleged use of excessive, but not deadly, force with his PR-24 baton during his response to a fight call is fundamentally different from the facts in the instant case, i.e., being confronted by a suspect holding a small silver object in his hands, standing in a shooting stance, and pointing the object in the direction of police officers.  See Roberts, 397 F.3d at 294.  Even if this Court assumes that the prior incident might reflect poorly on Officer Ramsey's judgment (a finding that has not been proven), it demonstrates nothing about his actual use of deadly force in a much different context, nor is it relevant to whether former Chief Roberts was on notice that Officer Ramsey might use excessive deadly force when confronted with a suspect who was holding a small silver object in his hands, standing in a shooting stance, and pointing such object in the direction of police officers.  See id.[11]

The Court finds that there is no material issue on the record before it with respect to the question of whether former Chief Roberts was deliberately indifferent with respect to the supervision and/or discipline of officers.  The facts in the summary judgment record simply do not demonstrate a prior pattern by Officer Ramsey of violating constitutional

_____

[11]While Plaintiffs have not asserted the applicability of the single incident exception, this Court, out of an abundance of caution, finds that such exception is inapplicable to this case.  For the single incident exception to apply, the plaintiff must prove that the highly predictable consequence of a failure to train/supervise would result in the specific injury suffered, and that the failure to train/supervise represented the moving force behind the constitutional violation.  See Brown v. Bryan County, 219 F.3d 450, 461 (5th Cir. 2000).  The Fifth Circuit "has been highly reluctant to permit this exception to swallow the rule that forbids mere respondeat superior liability."  Roberts, 397 F.3d at 295.
This is not a case where Officer Ramsey received no training.  See Record Document 39, Exhibits 11-13.  In fact, former Chief Roberts and Director of the Shreveport Police Academy Mike Campbell oversaw a significant training regimen for Officer Ramsey and all other police officers.  See id.  Due to this regimen, the Court can not find "unmistakable culpability" on the part of former Chief Roberts; therefore, the single incident exception is not applicable in this case.  Brown, 219 F.3d at 461.

rights by employing excessive force. Therefore, there is no proof of deliberate indifference on the part of former Chief Roberts. Accordingly, former Chief Roberts is entitled to qualified immunity and summary judgment as to the failure to supervise claims against him in his individual capacity is **GRANTED**.

### G. Section 1983 Claims Against the City.

Next, Plaintiffs assert Section 1983 claims against the City and former Chief Roberts in his official capacity,[12] arguing that Mr. Hudspeth's constitutional right to be free from excessive force under the Fourth Amendment was violated. Specifically, Plaintiffs allege that the City's police department had a policy of using deadly force against African-American citizens, whom the officers believed were disobeying their verbal commands to stop. Plaintiffs claim that such policy was a moving force behind the actions of Officer Hathorn and Officer Ramsey that resulted in them shooting Mr. Hudspeth rather than resorting to non-lethal force when it was feasible to do so. <u>See</u> Record Document 12, ¶ 89. Plaintiffs further contend that police officers also followed an "official code of silence" regarding their actions. <u>Id.</u>, ¶ 92. Plaintiffs allege that the City and its supervisory officials condoned the cultivated the use of excessive force against African-Americans via this "official code of silence." <u>Id.</u>, ¶¶ 97-98. Again, to support their municipal liability claim, Plaintiffs rely on four incidents where they allege that white Shreveport police officers used excessive and/or lethal force against unarmed African Americans.[13] Plaintiffs contend that

---

[12]Again, Plaintiffs' claims against former Chief Roberts in his official capacity are tantamount to claims against the City.

[13]In the first amended complaint, Plaintiffs listed:

(1) In January 1998, Shreveport Police Officer Robert Rivet, pulled his

the City and supervisory officials knew of such incidents, as well as the claimed settlement of a lawsuit in which Officer Ramsey was alleged to have used excessive non-lethal force against an African-American female, but did not provide Officer Ramsey or other officers with additional training on the proper use of force.  See id., ¶¶ 92, 99-100.

Section 1983 applies to municipalities such as the City of Shreveport, but just as in the case with supervisor liability against former Chief Roberts, vicarious liability principles are inapplicable.  Rather, it is when execution of a government's policy or custom inflicts the injury that the government as an entity is responsible under Section 1983.  See Monell v. Dep't of Social Services of New York, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38 (1978). To establish a municipality's liability for a constitutional tort, the plaintiff must show first,

_____

revolver and shot unarmed African American Patrick Morris after Rivet believed Morris had refused his verbal commands to stop; (2) On or about March 14, 1999, Shreveport Police Department Officer Robert Rivet fatally shot unarmed African American Undray [Carter] after Rivet believed Carter had disobeyed his verbal commands to stop, which such shooting was found by a federal jury to be in violation of the Fourth Amendment rights of Undray Carter; (3) On October 10, 2001, Shreveport Police Officer D.J. Gaut and other officers used deadly force to apprehend fugitive Fred Howard, an African American male, after Howard failed to obey their commands to stop his vehicle.  After chasing Fred Howard's vehicle, Shreveport Police Officer Gaut repeatedly shot at Fred Howard . . ., who was unarmed; (4) On July 20, 2001, Shreveport Police Officers shot unarmed African American Noble Bates after he led police on a car chase and refused to stop.

Record Document 12, ¶ 89.  The amended complaint also references the shooting of Andrew Prude by Officer Justin Olds.  See id., ¶ 99.  Plaintiffs do not even reference the alleged incidents, which are seemingly their only proof of a pattern of violation, in their opposition to the Motion for Summary Judgment.  See Record Document 49-1.  The only reference made to such incidents in Plaintiffs' Statement of Disputed Facts was a statement regarding Officer Robert Rivet: "even after a Federal Jury found that Shreveport Police Officer Robert Rivet had used excessive force in the fatal shooting of Undray Carter, Roberts did not terminate Rivet, nor discipline Rivet nor offer him additional training." Record Document 49-3, ¶¶ 19, 23.

that the municipality adopted a policy with "deliberate indifference" to its known or obvious consequences, and second, that the municipality was the "moving force" behind the constitutional violation.  Id.

Since Monell, the Fifth Circuit has defined "official policy" as:

(1)     A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

(2)     A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

Nobby Lobby, Inc. v. City of Dallas, 970 F.2d 82, 92 (5th Cir. 1992).  The Fifth Circuit requires that a Section 1983 plaintiff plead specific facts, not merely conclusory allegations, with sufficient particularity to meet all the elements of recovery.  See Fraire v. City of Arlington, 957 F.2d 1268, 1278 (5th Cir. 1992).  "This heightened pleading requirement applies to allegations of municipal custom or policy."  Id.  Here, Plaintiffs will have to provide specific facts to support their bald assertions that the City's policies, or its failure to implement additional policies as to training and supervision, violated Mr. Hudspeth's constitutional rights and contributed to his unfortunate and tragic death.  See id.

As to deliberate indifference, courts have generally held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact. . . .  Only where a municipality's failure to train its employees in a relevant respect

evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 388, 109 S.Ct. 1197, 1205 (1989). The same rationale applies to a failure to supervise claim. Stated another way, to establish deliberate indifference, a plaintiff must show at least a pattern of violations (fairly similar to what ultimately transpired) so that the failure of the city to respond with different training or better supervision reflects a deliberate or conscious choice to endanger constitutional rights. <u>Estate of Davis</u>, 406 F.3d at 381-83; <u>Roberts</u>, 397 F.3d at 292.

As stated in the Report and Recommendation issued in this case previously, Plaintiffs have identified with some degree of specificity a purported pattern of similar incidents that seem to be consistent with the informal policy that they allege exists. Even if this Court assumes for purposes of the instant Memorandum Ruling that Plaintiffs have demonstrated some sort of informal policy of using deadly force against African-American citizens, whom the officers believed were disobeying their verbal commands to stop, their municipal liability claim fails because they have not established that any such informal policy was adopted with deliberate indifference and/or that such policy was a moving force behind the actions of Officer Hathorn and Officer Ramsey that resulted in them shooting Mr. Hudspeth.

The Court finds that this is not a case where any alleged failure to train or supervise was a "deliberate" or "conscious" choice by the City or former Chief Roberts. Defendants have provided this Court with the City of Shreveport Police Department's use of force directive, the affidavit of former Chief Roberts and the affidavit of Mike Campbell ("Campbell"), who was the Director of the Shreveport Police Academy at the time of Mr.

Hudspeth's shooting.  See Record Document 39, Exhibits 11-13.  The use of force directive outlines the City's policy as to the use of force:

> It is this Department's policy that police officers shall use reasonable force to effectively bring an incident under control, while protecting the lives, safety and security of the officer and others.

See id., Exhibit 12.  The directive contains rules and regulations regarding the procedures for officers to report the use of force, specifically requiring officers to complete a subject management report and directing supervisors to review the use of force for compliance to department policies and procedures.  See id.

Former Chief Roberts' affidavit clearly evidences personal knowledge on his part as to the training and supervision of officers of the Shreveport Police Department.  Former Chief Roberts described a comprehensive policy on the use of lethal force.  See id., ¶ 6. He further stated that the "policy clearly sets forth the circumstances under which lethal force is appropriate" and that "officers undergo an extensive fourteen to sixteen week police academy training program designed to ensure that officers understand those concepts and can apply the lethal force standard set forth in the policy."  Id.  As part of continuing training and supervision, former Chief Roberts stated that "commencing in 1999 when [he] became the Chief of Police [he] also required that all officers undergo forty hours of additional training each year."  Id.  Former Chief Roberts also stated that he was not aware of any need for additional lethal force training on the part of either Officer Ramsey or Officer Hathorn; that he was not deliberately indifferent to the rights of suspects such as Mr. Hudspeth; and that it was not the policy, custom, or practice of the Shreveport Department to violate the Constitutional rights of suspects.  See id., ¶¶ 5, 7.

Likewise, in his affidavit, Campbell stated that he was particularly familiar with the

training provided Officer Ramsey and Officer Hathorn and that both officers had undergone the comprehensive training on use of force and lethal force prior to the shooting of Mr. Hudspeth in March 2003. See id., Exhibit 13, ¶¶ 1-2. More importantly, Campbell attested:

> The shooting of Mr. Hudspeth was carefully considered to determine whether additional training was needed, *which is regularly done after officer involved shootings*. I believed that the officers were adequately trained regarding stops, lethal force, and pursuits.

Id., ¶ 3 (emphasis added).

Plaintiffs have simply not countered the City's strong evidence. The City has presented evidence that its police officers are taught the requirements for use of deadly force and are adequately trained in the use of such force. Additionally, the record evidence contains rules and regulations promulgated by the City regarding the use of reasonable force, the reporting of uses of force, and internal reviews of all uses of force. See id., Exhibit 12. Such rules and regulations are supported by the affidavit of the director of the Shreveport Police Academy, who stated under oath that "the shooting of Mr. Hudspeth was carefully considered to determine whether additional training was needed, which is regularly done after officer involved shootings." Id., Exhibit 13. Other than Plaintiffs' own assertions, there is no evidence in the record that the City failed to train or supervise its police officer employees. Even considering the incidents outlined by Plaintiffs, the record evidence makes it abundantly clear to the Court that the need for more or different training and/or supervision as to the uses of force, including lethal force, for officers of the Shreveport Police Department was not "so obvious, and the inadequacy so likely to result in violation of constitutional rights, that the policymakers of the [C]ity can reasonably be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 390,

109 S.Ct. at 1205.  And while Plaintiffs have failed to show that Officer Hathorn, Officer Ramsey, or any other officer were unsatisfactorily trained as to the use of force, Plaintiffs have also not accounted for the fact that any shortcomings in the actions of the officers involved in the shooting of Mr. Hudspeth may have resulted from factors other than their training and/or any informal policy of the Shreveport Police Department.  See id., 109 S.Ct. at 1206.  Plaintiffs have not condemned the adequacy of the training program and/or the supervision of the officers of the Shreveport Police Department.  Likewise, Plaintiffs have presented no evidence that the alleged informal policy and/or any deficiency in the City's training or supervising actually caused indifference to Mr. Hudspeth's constitutional rights or was the "moving force" behind the shooting of Mr. Hudspeth.[14]

The same is true of Plaintiffs' claim that there exists a "code of silence" within the City of Shreveport Police Department.  Defendants have moved for summary judgment on this ground, arguing that there is no policy of infringing upon constitutionally protected rights of citizens via a code of silence.  Yet, Plaintiffs have come forward with no evidence, not even the usual policy papers, reports, and other hearsay evidence that case law seems to indicate is generally offered in support of a code of silence theory, to support their official code of silence theory.  See Snyder v. Trepagnier, 142 F.3d 791, 797 (5th Cir. 1998).

_____

[14]Plaintiffs also rely heavily upon Grandstaff v. City of Borger, 767 F.2d 161 (5th Cir. 1985), in support of their contention that former Chief Roberts' ratification of the acts of the officers involved in the shooting of Mr. Hudspeth equates to municipal liability.  However, Plaintiffs failed to note that "Grandstaff . . . does not stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior can be assumed to have resulted from an official policy."  Coon v. Ledbetter, 780 F.2d 1158, 1161 (5th Cir. 1986).  In fact, "the Grandstaff panel emphasized the extraordinary facts of the case, and its analysis can be applied only to equally extreme factual situations."  Id.

Their evidence is simply insufficient to support <u>Monell</u> liability on a code of silence theory. <u>See id.</u>

Based on the foregoing, Plaintiffs' Section 1983 claims against the City and Chief Campbell in his official capacity fail as a matter of law.

### G.    Louisiana State Law Claims.

Plaintiffs allege that Defendants' conduct is in violation of Louisiana Civil Code Article 2315.[15] <u>See</u> Record Document 49-1 at 10. These Louisiana tort claims presumably are also based on the Plaintiffs' assertion that Officer Hathorn and Officer Ramsey used excessive force. "Under Louisiana law, the same standard is used in analyzing a state law claim of excessive force as a constitutional claim, namely reasonableness under the circumstances." <u>Reneau v. City of New Orleans</u>, No. Civ.A. 03-1410, 2004 WL 1497711, *4 (E.D.La. July 2, 2004), citing <u>Kyle v. City of New Orleans</u>, 353 So.2d 969, 973 (La.1977) and <u>Mathieu v. Imperial Toy Corp.</u>, 94-0952 (La. 11/30/94), 646 So.2d 318; <u>see also</u> <u>Bellamore v. City of Westwego</u>, No. Civ. A. 00-1511, 2001 WL 214030, at *3 (E.D.La. March 5, 2001). Because this Court has found that Officer Hathorn and Officer Ramsey acted reasonably under the circumstances, Plaintiffs' state law claims must fail as well. Summary judgment in favor of Defendants is therefore **GRANTED** as to Plaintiffs' Louisiana tort claims.

Plaintiffs also allege that Defendants' conduct violated the Louisiana Constitution, specifically Mr. Hudspeth's right to be secure in his person, property, and effects against unreasonable searches, seizures, or invasions of privacy. <u>See</u> Record Document 12, ¶ 93.

---

[15]La. C.C. Art. 2315(A) states that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

Based on this allegation, Plaintiffs seem to allege a violation of Article I, Section 5 of the Louisiana Constitution. Louisiana federal district courts have noted that privacy principles embodied in the Fourth Amendment have been incorporated into Article I, Section 5 of the Louisiana Constitution. See Todd v. City of Natchitoches, Louisiana, 238 F.Supp.2d 793, 798 -799 (W.D.La. 2002); see also Molette v. City of Alexandria, No. Civ. A CV040501A, 2005 WL 2445432, at *1 (W.D.La. September 30, 2005) & State v. McKinney, No. 93-KA-1425 (La.App. 4 Cir. 5/17/94)), 637 So.2d 1120, 1125. Like the Fourth Amendment, Article I, Section 5 prohibits unreasonable search and seizures. See id. Again, because the Court has found that Officer Hathorn and Officer Ramsey are entitled to qualified immunity as to the Section 1983 claims arising under the Fourth Amendment, there is likewise no liability on the part of Officer Hathorn or Officer Ramsey or the City for violation of Article I, Section 5 of the Louisiana Constitution. Summary judgment in favor of Defendants is therefore **GRANTED** as to Plaintiffs' claims for violation of Article I, Section 5 of the Louisiana Constitution.

## III. CONCLUSION.

Based on the foregoing analysis, the Court finds that Plaintiffs' Section 1983 claims against Defendants under the Equal Protection Clause fail on the merits, as they presented no competent summary judgment evidence of intentional or purposeful discrimination based on race. Plaintiffs' Section 1983 claims against Officer Ramsey and Hathorn for violation of the Fourth Amendment are dismissed, as the officers are entitled to qualified immunity. Plaintiff's Section 1983 supervisory and municipal claims against former Chief

Roberts and the City under the Fourth Amendment likewise fail.[16]

Accordingly, Defendants' Motion for Summary Judgment (Record Document 39) is **GRANTED**. Plaintiffs' claims against all Defendants are **DISMISSED WITH PREJUDICE**. The Clerk of Court is asked to close this case.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this 18th day of December, 2006.

_____
S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE

---

[16]Defendants' have filed an Objection to Plaintiffs' Summary Judgment Evidence (Record Document 57), which this Court has essentially treated as a motion to strike portions of Mr. Melvin L. Tucker's ("Tucker") affidavit. Defendants argue that Tucker, Plaintiffs' expert, offered conclusory opinions lacking any evidentiary support, as well as opinions that are not relevant to issues before the Court. See id.

Out of an abundance of caution, the Court reviewed and considered the contents of Tucker's affidavit when ruling on the Motion for Summary Judgment. While the Court's ruling on the Motion for Summary Judgment is inconsistent with Tucker's opinions, such opinions were considered and, therefore, the Defendants objections are overruled and the motion to strike is **denied**.